FAC, INC. d/b/a Financial Advisors and Consultants, Inc., Plaintiff,

v.

COOPERATIVA DE SEGUROS DE VIDA, et al., Defendants.

No. Civ. 98–1592(JP).

United States District Court,
D. Puerto Rico.

June 28, 2000.

Etienne Totti Del Valle, Totti & Rodriguez Diaz, San Juan, PR, for plaintiff.

Esther Castro Schmidt, San Juan, PR, for defendants.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

Before the Court is Defendants' Legal Memorandum in Compliance with Court Order and Request for Dismissal (**docket No. 60**), Plaintiff's Memorandum of Law and Authorities (docket No. 67), Defendants' Reply (docket No. 81), Plaintiff's

Sur–Reply (docket No. 91), and Supplemental Briefs (**docket Nos. 130, 131**). Plaintiff FAC, INC. ("FAC") brings this action against Cooperativa de Seguros de Vida ("COSVI"), Gabriel Dolagaray Balado, José A. Brull Cestero, María Cristina Ortiz, Arcilio Rivas Rodríguez, Andrés Rodríguez Figueroa, and Daniel Santiago under the civil provisions of the Racketeering Influenced Corruption Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d), and the Fifth Amendment to the U.S. Constitution. Plaintiff also invokes this Court's pendent jurisdiction under 28 U.S.C. § 1367 for Defendants' alleged tortious conduct under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R.Laws Ann. tit. 31, § 5141.

FAC, a Puerto Rico corporation, is engaged in the business of providing financial, accounting and health care counseling. FAC entered into a contract with the Puerto Rico Department of Health ("Department of Health") to handle Medicare reimbursement claims for the Health Department and the Puerto Rico Administration of Medical Facilities ("AFASS") through the Health Care Financing Administration ("HCFA") program. By contract with HCFA, COSVI is a fiscal intermediary between Medicare and health care providers in Puerto Rico. The remaining co-defendants are officers or employees of COSVI: Gabriel Dolagaray Balado ("Dolagaray") is the President of COSVI, Andrés Rodríguez Figueroa ("Rodríguez") is the Assistant Vice President of the Audit and Reimbursement Division of Medicare, José A. Brull Cestero ("Brull") is a Vice President of the Medicare Division, María Cristina Ortiz ("Ortiz") was the Executive Vice President, Arcilio Rivas ("Rivas") was the Director of Reimbursement for Medicare, and Daniel Santiago ("Santiago") was the Audit Director for Medicare.

FAC alleges that Defendants conspired to wrongfully disapprove reimbursement claims submitted by FAC and demanded kick-backs in exchange for the approval of pending claims. Defendants advance several grounds for dismissal of the Complaint. First, they maintain that the Court lacks jurisdiction to review COSVI's Medicare claims decisions under 42 U.S.C. § 405(h). Second, Defendants contend that COSVI and its officials are government agents and, as such, they enjoy official immunity under *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). Third, Defendants argue that FAC has failed to properly state a RICO cause of action in its Complaint. Finally, Defendants move to dismiss FAC's pendent claims if the Court dismisses the federal RICO claim.

## II. LEGAL STANDARD

Before setting forth the legal standard that the Court will apply in adjudicating the motion before it, the Court must determine whether to convert the motion to dismiss into a motion for summary judgment. Plaintiff attaches to its opposition two sworn statements by William Soria Rivera, excerpts from the deposition of Arcilio Rivas Rodríguez, and a letter dated August 2, 1996 from the Health Care Financing Administration to Antonio Marrero of FAC. Consideration of a Rule 12(b)(6) motion to dismiss is generally limited to the facts stated on the face of the Complaint, documents appended to the Complaint, documents incorporated by reference, and matters of which judicial notice may be taken. *See Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); James W. Moore, 2 Moore's Federal Practice § 12.34[2] (3d ed.1998). When matters outside the pleadings are presented with a motion to dismiss under Rule 12(b)(6), the Court may either exclude those matters or treat the motion as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(b). Because the appended documents add nothing to Plaintiff's arguments as they bear upon the matters discussed herein, the Court will exclude the documents appended to Plaintiff's opposition from consideration, save the deposition transcript of co-defendant

Rivas, which is appended to Plaintiff's Fourth Amended Complaint.

In adjudicating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true "all well-pleaded factual averments and indulg[e] all reasonable inferences in the plaintiff's favor." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996) (citations omitted). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir.1991). Although there is a low threshold for stating a claim, the pleading requirement is "not entirely a toothless tiger." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 190 (1st Cir.1996) (quoting *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989)). A complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 28 n. 2 (1st Cir.1996) (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988)). For the purposes of this motion, therefore, all factual allegations in the Complaint will be accepted as true and viewed in the light most favorable to Plaintiff.

### III. FACTUAL ALLEGATIONS

Plaintiff FAC states that as a consultant for the Department of Health, it filed a request with COSVI on June 28, 1995 to reopen Cost Reports for the years 1988 to 1992. Once a reopening is requested and a determination of good cause is made, it is common practice for COSVI to give providers an advance payment on the requested amount, as if the cost had been included in the original report. FAC requested an advance payment from COSVI for the alleged reimbursement amounts. Before agreeing to deal with FAC, COSVI requested authorization from the Department of Health showing that FAC had authority to make such a request. FAC claims that this request for authorization was unusual.

Once COSVI began to deal with FAC, FAC received a call in July 1995 from Andrés Rodríguez, COSVI's Vice President of Reimbursement and Audit. In late July 1995, FAC's treasurer, William Soria ("Soria"), and Rodríguez met to discuss the reopening of the Cost Reports. FAC alleges that Rodríguez requested a meeting with two FAC officers, Marrero and González, and further stated that he was in a position to influence the approval of FAC's pending claims. Marrero and González refused to meet with Rodríguez.

On September 19, 1995, COSVI officials, including Rodríguez, met with staff of the Health Care Financing Administration (HCFA) New York Region II Office to discuss FAC's $22.6 million reimbursement claim. Soon after the meeting, Rodríguez called Soria to inform him that the request for reopening was going to be denied.

The week of October 17, 1995, Rodríguez again contacted Soria, telling him that a scheduled "entrance conference" was not going to be held and that things would not be easy for FAC. In late October or early November, Rodríguez called Soria to request a meeting with FAC's Vice President, Antonio Marrero, but Marrero would not agree to such a meeting.

On November 20, 1995, Soria and Rodríguez met at the El Hipopótamo Restaurant in Río Piedras, Puerto Rico. At this meeting, Rodríguez told Soria that FAC would have to make payments or kickbacks to him in order for the reopenings to be approved. According to FAC, Rodríguez specifically stated that highly positioned COSVI officers were involved in the kick-back scheme, and that unless FAC agreed to pay, the Department of Health would not receive any money from their reopening requests. FAC reported these

interactions to the Federal Bureau of Investigation ("F.B.I.") in a meeting on November 28, 1995.

On November 30, 1995, Soria met with Rodríguez while wired by the F.B.I. During this meeting, Rodríguez demanded 40% of FAC's commission of $5.5 million. Then on December 2, 1995, Soria and Rodríguez met once again. Rodríguez stated that a small payment would be made to FAC to test FAC's willingness to pay the kick-back. A payment of $62,000.00 was allegedly made, and Rodríguez demanded the kick-back. Soria, acting pursuant to F.B.I. instructions, refused to pay Rodríguez. At that point, there was no further contact with Rodríguez and a reopening of the Cost Reports was not granted, despite ample evidence provided by FAC warranting a reopening.

In addition to the foregoing factual allegations, the parties previously stipulated to the following facts:

a. FAC is a duly organized corporation under the laws of Puerto Rico.

b. FAC was engaged in the business of providing financial, accounting and health care counseling to its clients, including the Puerto Rico Department of Health.

c. COSVI is an entity authorized to do business in Puerto Rico.

d. FAC was authorized by Carmen A. Feliciano de Melecio, Secretary of Health for the Puerto Rico Department of Health, and AFASS, to represent them and file claims on their behalf with COSVI.

e. COSVI is a fiscal intermediary between Medicare and certain medical providers regarding services in Puerto Rico.

f. Gabriel Dolagaray Balado was and is the President of COSVI, Andrés Rodríguez Figueroa was and is the Assistant Vice President of the Audit and Reimbursement Division of Medicare at COSVI, José A. Brull Cestero was and is a Vice President of the Medicare Division at COSVI, María Cristina Ortiz was the former Executive Vice President of COSVI, Arcilio Rivas was the Director of Reimbursement for Medicare at COSVI, and Daniel Santiago was the Audit Director for Medicare at COSVI. Andrés Rodríguez Figueroa was COSVI's Vice President for Audit and Reimbursement during the facts relevant to the pending complaint.

g. The Health Care Financing Administration ("HCFA"), a federal agency that pays out Medicare Part A funds through fiscal intermediaries, contracted with COSVI to be the Medicare fiscal intermediary for Puerto Rico and the Virgin Islands.

h. The Department of Health and AFASS are providers of medical services and obtain Medicare funds through COSVI. Plaintiff FAC was a Consultant for the Department of Health.

i. HCFA makes certain reimbursements from the Medicare Program through its fiscal intermediary, COSVI.

j. HCFA appoints by contract the intermediary between it and the local hospitals. The intermediary is responsible for examining certain claims.

k. The Department of Health is qualified to receive reimbursement from Medicare through a fiscal intermediary.

l. Medical providers, such as the Department of Health, give COSVI a "Cost Report" at the end of each fiscal year in order to compare any Medicare costs they had already reported with the payments actually made to them.

m. COSVI audits the Cost Reports and then issues a Notice of Program Reimbursement indicating a settlement amount ("NPR"). The provider may seek review of the NPR

with the Provider Reimbursement Review Board ("Review Board") within 180 days of its issuance. The Review Board's decision can be reversed or modified by the Administrator, whose decision can ultimately be appealed.

n. A provider may also request that COSVI reopen a Cost Report for up to three years after Notice is issued. A provider hires Consultants, such as FAC, to audit the provider's records and identify any unpaid Medicare expenses. A provider may also have simply left out certain reimbursable costs in its Cost Report.

o. If and when any unpaid expenses are identified, the Consultant files for a reopening of the Cost Report with COSVI in order to determine whether the expenses should be paid. COSVI and/or COSVI officials have discretion to decide whether or not to grant a reopening of the Cost Report.

p. On June 28, 1995, FAC submitted a letter to COSVI summarizing the additional costs claimed on behalf of the Department of Health for each fiscal year identified by each cost item. The total amount of $22,664,067.00 for unreimbursed costs were requested on behalf of the Department of Health.

q. On July 7, 1995, COSVI wrote a letter signed by José A. Brull to the Secretary of the Commonwealth Health Department verifying the authority of FAC to participate in the claims procedure since COSVI had other consultants who were appearing on behalf of the Department of Health.

r. On September 19, 1995, the Deputy Director and other staff members of HCFA New York, Region II Office and COSVI staff, among others, José A. Brull and Andrés Rodríguez met with the Secretary of Health of the Department of Health and other members of her staff to discuss several matters.

s. FAC was not present at the September 19, 1995 meeting.

t. On October 23, 1995, a meeting was held at COSVI's offices to explain the reopening procedures to FAC consultants.

u. On November 22, 1995, COSVI set up the procedure that it would follow with FAC regarding the handling of its claims including: evaluating time limitations; determining "good cause"; issuing notices of reopening or refusal to reopen; scheduling an "entrance conference" in order to subsequently request supporting documents and final audit or examination.

v. The F.B.I. received information regarding the facts alleged in the pending complaint before any of the officers at COSVI had had contact with the F.B.I. about this matter.

w. On or about January 1996, Andrés Rodríguez was interviewed by F.B.I. agents as a result of the information received by the F.B.I. concerning the facts alleged in the complaint.

x. At some point after the F.B.I. received the information regarding the facts alleged in the complaint, other interviews of COSVI personnel were conducted by F.B.I. agents.

y. FAC requested the reopening of the Cost Report regarding the University Hospital of Río Piedras, Mayaguez Regional Hospital and Ponce Regional Hospital.

z. The request for reopening regarding the University Hospital was partially granted with respect to certain related costs.

aa. COSVI has an insurance policy that covers errors and omissions.

bb. Plaintiff contracted to provide services to the Department of Health after its incorporation.

## IV. LACK OF SUBJECT MATTER JURISDICTION

Defendants challenge the Court's jurisdiction in this matter. They argue that because a determination of damages would necessarily entail a review of the merits of Plaintiff's Medicare reimbursement claims, which is barred by 42 U.S.C. § 405(h) and 42 U.S.C. § 1395ii, Plaintiff's cause of action is not justiciable. Section 405(h), a provision of the Social Security Act made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that no action may be brought against the Secretary of Health and Human Services, or any officer or employee thereof,[1] "to recover on any claim arising under [the Medicare Act]," except as provided in section 405(g).[2] 42 U.S.C. § 405(h); 42 U.S.C. § 1395ii (West Supp.1999). Section 405(g) outlines the administrative remedies that constitute the sole vehicle for challenging a determination of benefits; it permits judicial review only after those administrative remedies have been exhausted. *See* 42 U.S.C. § 405(g).

Section 405(h), as modified by section 1395ii, only precludes actions "arising under" the Medicare Act from being instituted in a federal court prior to the exhaustion of administrative remedies. The two leading cases construing this language, *Weinberger v. Salfi*, 422 U.S. 749, 764–66, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (under the Social Security Act) and *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct.

2013, 80 L.Ed.2d 622 (1984) (under the Medicare Act), have given it a broad construction. In *Salfi*, the U.S. Supreme Court construed the phrase "arising under" to encompass claims challenging the constitutionality of a duration-of-relationship requirement under the Social Security Act. While recognizing that the plaintiffs' claims arose in part under the U.S. Constitution, the Court observed that they also "arose under" the Social Security Act because (1) they sought to recover Social Security benefits, and (2) the Social Security Act provided both the standing and the substantive basis for their constitutional contentions. *See id.* at 760–61, 95 S.Ct. at 2464.

In *Heckler*, the Supreme Court addressed the "arising under" language in the context of the Medicare Act. The respondents in *Heckler* sued the Secretary of Health and Human Services, challenging an administrative instruction issued by the same that directed all fiscal intermediaries to deny Medicare claims for a surgical procedure known as bilateral carotid body resection (BCBR). *See Heckler*, 466 U.S. at 607, 104 S.Ct. at 2017. The respondents, who had or wished to have the surgical procedure performed on them, and were denied reimbursement or prevented from having the surgery without Medicare funds, sought a declaration that the Secretary's action was unlawful and an injunction compelling her to instruct her intermediaries to reimburse BCBR claims. *See id.* at 609–11, 104 S.Ct. at 2018–19.

■ *Heckler* affirmed *Salfi*'s broad reading of the "arising under" language in

---

1. Section 405(h) applies to fiscal intermediaries. *See Gerardi v. Travelers Ins. Co.*, 961 F.Supp. 28 (D.Conn.1996); *Westchester Management Corp. v. United States Dept. of Health & Human Servs.*, 790 F.Supp. 159 (S.D.Ohio), *aff'd*, 948 F.2d 279 (6th Cir.1991), *cert. denied*, 504 U.S. 909, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992).

2. Section 405(h) provides:
   The findings and decision of the ... [Secretary of Health and Human Services] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the ... [Secretary of Health and Human Services] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the ... [Secretary of Health and Human Services], or any officer of employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

section 405(h), holding that actions indirectly seeking the recovery of benefits under the Medicare Act, even though styled as a claim for declaratory and injunctive relief, may not be brought before a federal district court before exhausting administrative remedies pursuant to section 405(g). *See Heckler*, 466 U.S. at 615–16, 104 S.Ct. at 2022. The Supreme Court observed that "[f]ollowing the declaration which respondents seek from the Secretary—that BCBR surgery is a covered service—only essentially ministerial details will remain before respondents would receive reimbursement." *Id.* at 615, 104 S.Ct. at 2022. The Court accordingly concluded that because the respondents' claims were "inextricably intertwined with what ... is in essence a claim for benefits," they arose under the Medicare Act. *Id.* at 624, 104 S.Ct. at 2026.

■ Plaintiff argues that its cause of action is not barred by *Salfi* and *Heckler* because it does not seek to recover Medicare benefits either directly or indirectly, and because RICO furnishes standing and the substantive basis for the presentation of Plaintiff's claims. The Court agrees that RICO, not the Medicare Act, provides standing and the substantive law governing Plaintiff's claims. Further, Plaintiff seeks lost business profits that occurred as a result of an alleged bribery scheme that led to the improper denial of benefits. Plaintiff is not a Medicare provider entitled to receive Medicare benefits, but rather a consultant to health care facilities seeking to recover such benefits. Even the retroactive payment of Medicare benefits could not remedy the harms Plaintiff alleges to have suffered by the loss of a lucrative business contract with the Department of Health. Thus, unlike the respondents in *Heckler*, Plaintiff's claims do not "at bottom" seek reimbursement of Medicare claims, and thus are not "inextricably intertwined" with a claim for Medicare benefits. *See Heckler*, 466 U.S. at 614, 104 S.Ct. at 2021; *see also Ardary v. Aetna Health Plans of California, Inc.*, 98

F.3d 496, 497 (9th Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *Ellis v. Blum*, 643 F.2d 68, 75–76 (2d Cir.1981).

In *Ardary*, the defendants challenged the court's jurisdiction to hear state law tort claims against a Medicare provider that had denied plaintiffs' deceased relative Medicare benefits under Part A of the Medicare Act, arguing that the court lacked jurisdiction pursuant to section 405(h). *See Ardary*, 98 F.3d at 498. The Ninth Circuit concluded that section 405(h) did not bar plaintiffs' claims because plaintiffs were seeking damages in tort, rather than unpaid benefits. *See id.* at 499–500. Plaintiffs' claims therefore did not "arise under" the Medicare Act within the meaning of section 405(h). *See id.* at 501; *see also Chilicky v. Schweiker*, 796 F.2d 1131, 1135 (9th Cir.1986), *rev'd on other grounds*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (constitutional tort claims against state actors not barred by section 405(h) because plaintiffs not seeking payment of Medicare benefits); *Albright v. Kaiser Permanente Medical Group*, No. C98–0682, 1999 WL 605828, *3 (N.D.Cal. Aug. 3, 1999) (tort claims not barred by Medicare Act because plaintiffs not seeking unpaid Medicare benefits); *Caputo v. United States Health Care Systems of PA*, No. Civ. A. 98–5542, 1998 WL 808611, *2 (E.D.Pa. Nov.23, 1998) (same); *Wartenberg v. Aetna U.S. Healthcare, Inc.*, 2 F.Supp.2d 273, 275–76 (E.D.N.Y. 1998) (same).

Additionally, in *Ellis*, the Second Circuit held that section 405(h) did not preclude a suit for emotional distress against state officials exercising authority delegated to them by the Secretary of Health and Human Services ("Secretary") to make initial determinations as to eligibility for disability benefits under the Social Security Act. *See Ellis*, 643 F.2d at 76. The plaintiffs in the class action suit charged state authorities with threatening to terminate or terminating their disability benefits without providing them with prior written notice

containing a summary of the evidence leading to the proposed termination and the reasons for termination, in violation of the due process clauses of the Fifth and Fourteenth Amendments, the Social Security Act, and the SSA's Manual. *See id.* at 71–72. The Second Circuit held that although section 405(h)

> extends to suits in which claims against state officials are merely disguised disputes with the Secretary of the sort described in §§ 405(g) and (h), that is not this case. Clearly, section 405(h) does not bar plaintiff's claim against the state defendants for damages to redress her emotional distress, since, even if this were alleged against the Secretary, it would not be a claim "arising under" Title II [of the Social Security Act].

*Id.* at 75.

Similarly, FAC does not seek to recover the reimbursement of Medicare claims from Defendants; rather, FAC claims damages in the form of lost profits due to Defendants' alleged unlawful acts under RICO. This case is thus analogous to *Ardary, Ellis,* and their progeny, where the nature of the relief sought led those courts to conclude the actions did not "arise under" the Medicare Act within the meaning of section 405(h). Indeed, although Defendants vigorously contend otherwise, the Court would not necessarily have to examine the claims themselves to determine whether Plaintiff was harmed by Defendants under RICO. The mere refusal to participate in a bribery scheme, regardless of the merit of the claims Plaintiff submitted on behalf of its clients, could have caused harm to Plaintiff in the sense that such would result in a *de facto* bar to the consideration of any of its submissions regardless of their merit. Defendants, therefore, are not necessarily insulated from civil liability under RICO simply because there may have existed a basis for denying Plaintiff's claims under the Medicare Act.

Defendant relies heavily on *Bodimetric Health Services, Inc. v. Aetna Life & Ca-*sualty, 903 F.2d 480 (7th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990). Bodimetric owned and operated home health agencies providing in-home medical services that were reimbursed by Medicare through a fiscal intermediary, Aetna Life & Casualty ("Aetna Life"). Although Aetna Life initially reimbursed most of Bodimetric's claims, after receiving a critical evaluation of its performance by the Department of Health and Human Services, it began to deny a substantial number of claims, including those of Bodimetric. Bodimetric alleged that these arbitrary denials of its Medicare Part B claims forced it to close its facilities, causing it to lose eight million dollars. Bodimetric sued Aetna Life in federal court on fraud and other state law tort theories. *See id.* at 482–84.

The Seventh Circuit affirmed the dismissal of the action for lack of subject matter jurisdiction, finding that Bodimetric's claim, at bottom, rested on the denial of certain Medicare claims, and thus indirectly sought to recover those amounts. *See id.* at 486. As explained by that Court: "A party cannot avoid the Medicare Act's jurisdictional bar simply by styling its attack as a claim for collateral damages instead of a challenge to the underlying denial of benefits." *Id.* at 487.

The Seventh Circuit rested its holding on *United States v. Erika,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). *See Bodimetric,* 903 F.2d at 486. In *Erika,* the Supreme Court held that amount determinations, to decide the amount of the Medicare payment to be made on a particular claim under the Part B claims process, are not judicially reviewable. *See Erika,* 456 U.S. at 208, 102 S.Ct. at 1654. Several years later, in *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Supreme Court expressly limited *Erika*'s holding to Medicare Part B amount determinations. Because the case at bar involves Part A of the Medicare Act, however, the Supreme Court's expressions in

*Erika,* which subsequently formed the basis of the Seventh Circuit's holding in *Bodimetric,* are simply inapposite. As such, the Court holds that for the reasons stated above, FAC's claims are not subject to administrative exhaustion under sections 405(h) and 1395ii. Accordingly, this Court concludes that it has subject matter jurisdiction over the instant action.

## V. OFFICIAL IMMUNITY AND *WEST-FALL v. ERWIN*

Defendants argue that the Complaint should be dismissed because they are entitled to absolute immunity for their actions. Because COSVI is a fiscal intermediary between Medicare and health care providers in Puerto Rico, and the individual co-defendants are officials of COSVI, Defendants maintain that they are government agents. As government agents, the argument goes, they enjoy official immunity for their discretionary acts. Defendants contend that the acts complained of are properly construed as discretionary, and thus within the scope of the doctrine of official immunity as set forth in *Westfall.* Plaintiff counters, however, that the doctrine of official immunity does not shield government agents acting outside the scope of their employment and outside the scope of their discretionary authority. The burden rests on Defendants to establish that they are entitled to the protective cloak of immunity. *See Westfall,* 484 U.S. at 299, 108 S.Ct. at 585. Plaintiff argues that Defendants have failed to maintain their burden.

The Court notes at this juncture, for purposes of clarification, that *Westfall* immunity only attaches to conduct alleged to be tortious under state common law. *See id.* at 295, 108 S.Ct. at 583. Both parties overlooked this aspect of the *Westfall* doctrine in their arguments, and Defendants seemed to suggest that the entire cause of action could be barred by absolute immunity. This is clearly not the case, however, and the Court admonishes Defendants for what is at best carelessness, and at worst a misleading legal argument. The following

discussion, therefore, bears only on whether COSVI and its officials may be held liable for the state law tort claims raised in the Complaint.

### A. Absolute Immunity Versus Discretionary Function Immunity

■ In *Westfall,* the U.S. Supreme Court held that the judicially created doctrine of official immunity does not provide absolute immunity to government employees for common law torts committed in the scope of their employment. *See id.* at 297–98, 108 S.Ct. at 584. Conduct by federal officials must be discretionary in nature and within the scope of their official duties before it is accorded absolute immunity. *See id.* The rationale behind discretionary function official immunity "rests on the view that the threat of liability will make federal officials unduly timid in carrying out their official duties," thereby undermining the exercise of independent judgment, which is necessary for effective government. *Id.* at 294, 296–97, 108 S.Ct. at 583, 584. Because the Supreme Court has recognized that absolute immunity "comes at a great cost," even after determining that a federal official is otherwise entitled to absolute immunity, such immunity will only be granted when " 'the contribution to effective government in particular contexts' from granting immunity 'outweighs the potential harm to individual citizens.' " *United States v. Smith,* 499 U.S. 160, 163, 111 S.Ct. 1180, 1183, 113 L.Ed.2d 134 (1991) (quoting *Westfall,* 484 U.S. at 299, 108 S.Ct. at 585).

Congress responded to the Supreme Court's ruling in *Westfall* by enacting the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub.L. No. 100–694, 102 Stat. 4563, or the so-called Westfall Act, as an amendment to the Federal Tort Claims Act (FTCA). The Westfall Act confers absolute immunity on federal officials, making an FTCA action against the government "the exclusive remedy for torts committed by Government employees *in the scope of their*

*employment."* *Smith,* 499 U.S. at 163, 111 S.Ct. at 1183–84 (emphasis added); *see also* 28 U.S.C. § 2679(b)(1). In such cases, any suit "shall be deemed an action against the United States under the provisions of [the Federal Tort Claims Act] and the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1). The substitution is accomplished by means of a certification by the Attorney General "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1) and (d)(2). Where the Westfall Act is found to be inapplicable, however, "the more restrictive common-law rule limiting official immunity to discretionary conduct" is still available. *Midland,* 145 F.3d at 1005; *see also Beebe v. Washington Metro. Area Transit Auth.,* 129 F.3d 1283, 1289 (D.C.Cir.1997); *Mangold v. Analytic Servs., Inc.,* 77 F.3d 1442, 1447 n. 4 (4th Cir.1996).

The Court notes that Defendants have not presented evidence of the above-described certification by the Attorney General. Absent certification that the Defendants were acting within the scope of their office or employment at the time of the incidents out of which the claim arose, absolute immunity under the Westfall Act is unavailable. *See* 28 U.S.C. § 2679(d)(1) and (d)(2); *see also Midland Psychiatric Assocs. v. United States,* 145 F.3d 1000, 1004 (8th Cir.1998). The question becomes, then, whether COSVI and its officials enjoy immunity under the federal common-law doctrine of official immunity as articulated by the Supreme Court in *Westfall. See Westfall,* 484 U.S. at 297–98, 108 S.Ct. at 580; *see also Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456 (1st Cir.1985).

### B. Are Defendants Government Agents?

■ To qualify for official immunity, a defendant must be a government official or agent. It is "well settled that Medicare intermediaries and carriers can be governmental agents for immunity purposes." *Bushman v. Seiler,* 755 F.2d 653, 655 (8th Cir.1985) (citing *Anderson v. Occidental Life Ins. Co.,* 727 F.2d 855, 856 (9th Cir. 1984); *Matranga v. Travelers Ins. Co.,* 563 F.2d 677 (5th Cir.1977); *Peterson v. Weinberger,* 508 F.2d 45, 51–52 (5th Cir.), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975)); *see also Bodimetric Health Services, Inc. v. Aetna Life & Cas.,* 903 F.2d 480 (7th Cir.1990) (holding that private insurer serving as Medicare fiscal intermediary is considered federal officer or employee). Fiscal intermediaries are private insurers that administer payments to health care providers under the Medicare "Part A" program. *See United States ex rel. Rahman v. Oncology Assocs.,* 198 F.3d 502, 512 n. 2 (4th Cir.1999); 42 U.S.C. § 1395h(a) (West Supp.1999). A fiscal intermediary "contract[s] with the Secretary [of Health and Human Services] to determine for the Secretary whether services provided ... are covered under the Medicare Act and the amount due the provider of services." *Homewood Professional Care Center, Ltd. v. Heckler,* 764 F.2d 1242, 1244 n. 2 (7th Cir.1985) (citing 42 U.S.C. § 1395h). Medicare carriers, on the other hand, are private insurers that administer payments to health care providers under the Medicare "Part B" program. *See* 42 U.S.C. § 1395u. Fiscal intermediaries and carriers perform analogous duties, and courts have treated them interchangeably. *See Oncology Assocs.,* 198 F.3d 502, 512 n. 2; *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 72 (2d Cir.1998); *United States v. Suba,* 132 F.3d 662, 665 & n. 4 (11th Cir.1998).

COSVI is a fiscal intermediary between Medicare and health care providers in Puerto Rico. Because COSVI and its officials act as agents of the Secretary of Health and Human Services in carrying out administrative responsibilities under the Medicare Act, they are properly considered agents of the federal government for the purposes of official immunity. *See*

*Midland,* 145 F.3d at 1005 (holding that fiscal intermediary is government agent for purposes of official immunity); *Bushman,* 755 F.2d at 655 (Medicare carrier is government agent in context of official immunity inquiry).

## C. The Discretionary Conduct Component

*Westfall* further holds that only discretionary conduct by federal officials is accorded absolute immunity. *See Westfall,* 484 U.S. at 297–98, 108 S.Ct. at 584. The cost to injured parties whose meritorious claims are non-compensable, and to society as a whole for failing to hold individuals accountable for their wrongful conduct, is too great to extend absolute immunity to all conduct by federal officials. *See id.* at 295–96, 108 S.Ct. at 583. As explained by the U.S. Supreme Court, "[i]t is only when officials exercise decision making discretion that potential liability may shackle 'the fearless, vigorous, and effective administration of policies of government.'" *Id.* at 297, 108 S.Ct. at 584 (quoting *Barr v. Matteo,* 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959)).

Fiscal intermediaries determine whether health care services provided are covered under the Medicare Act and the amount due the provider of services. *See id.;* 42 C.F.R. §§ 421.3, 421.100(a) (1999). In deciding whether to reimburse Medicare claims, fiscal intermediaries must consider whether the services furnished were reasonable, medically necessary, and furnished in the most appropriate setting. *See* 42 C.F.R. § 421.100(a). These are inherently discretionary functions. *See Midland,* 145 F.3d at 1005 (finding that Medicare carriers exercise discretion in rendering claims decisions and that such decisions "plainly satisfy Westfall's discretionary conduct requirement").

## D. Scope of Official Duties

■ The Court's conclusion that Defendants, as fiscal intermediaries, engage in discretionary conduct when processing Medicare reimbursement claims does not, however, dispose of the issue of official immunity. It is only when exercising these discretionary functions that official immunity attaches, and only to the extent that the conduct falls within the "outer perimeter of [the official's] ... line of duty." *Ricci,* 768 F.2d at 462 (quoting *Barr,* 360 U.S. at 575, 79 S.Ct. at 1341). For purposes of the immunity analysis, the First Circuit has held that the scope of an official's authority is to be read expansively. *See id.; see also Kassel v. United States Veterans Admin.,* 682 F.Supp. 646, 654 (D.N.H.1988); *Salvador v. Meese,* 641 F.Supp. 1409, 1417 (D.Mass.1986). The conduct "need only be more or less connected to 'the general matters committed by law to his [or her] control or supervision' and 'not manifestly or palpably beyond his [or her] authority.'" *Ricci,* 768 F.2d at 462 (quoting *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)). The subjective motivation behind the official's conduct is not taken into account in this analysis; even proof of deliberate malice on the part of the official is insufficient to defeat the immunity defense. *See id.* (citing *Barr,* 360 U.S. at 571–75, 79 S.Ct. at 1339–42). Rather, the Court asks whether the conduct is the "kind of action which, if done for legitimate purposes, falls within the scope of the official's authority." *Id.* (citing *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949)).

The Court must look at the particular conduct alleged in the Complaint to determine whether it is the kind of action which falls within the scope of the Defendants' authority. FAC alleges that, in connection with the processing of claims for Medicare reimbursement pending before COSVI, co-defendant Rodríguez asked for kick-backs or bribes in order for FAC's claims to be approved. (Compl.¶¶ 14, 24, 27, 29, 31). FAC also argues that COSVI negligently supervised its employees, in violation of article 1803 of the Puerto Rico Civil Code, by failing to prevent the conduct by individual COSVI officials named in the Com-

plaint. Broadly speaking, the meetings between Soria and co-defendant Rodríguez, during which the allegedly unlawful acts occurred, did relate to Defendants' decision whether to reimburse FAC's Medicare claims. But even while broadly construing the outer perimeters of Defendants' authority, the acts complained of insofar as they relate to the demanding of kick-backs or bribes in exchange for a favorable claim reimbursement recommendation, are not within the sphere of authority allocated to Defendants as fiscal intermediaries. Defendants' discretionary authority to determine whether health care services are covered under the Medicare Act and the amount due the health care provider does not presuppose the authority to solicit kick-backs aimed at improperly influencing the claims determination.

Those cases holding fiscal intermediaries or Medicare carriers immune from suit for common law torts all involve conduct directly related to the Medicare reimbursement determination, solidly within the statutory authority granted them. For instance, courts have granted immunity to fiscal intermediaries and carriers for rendering a mistaken opinion that caused the plaintiff to lose money, *see Group Health Inc. v. Blue Cross Ass'n*, 739 F.Supp. 921, 923–33 (S.D.N.Y.1990), for mistakenly reporting fraud on the part of a health care provider, *Bushman*, 755 F.2d at 655–56 (8th Cir.1985), or for wrongfully denying benefits. *See Midland Psychiatric Assocs. v. United States*, 969 F.Supp. 543, 551 (W.D.Mo.1997), *aff'd*, 145 F.3d 1000 (8th Cir.1998). In all of these cases, the fiscal intermediary or carrier was carrying out its statutory duties and the suit related to a matter within the discretion exercisable by them as conferred by the statute.

With respect to legislative officials, who similarly enjoy absolute immunity for dis-

cretionary functions within their official duties, the U.S. Supreme Court has expressed that "[t]aking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act." *United States v. Brewster*, 408 U.S. 501, 526, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972). Likewise, although federal officials are accorded broad immunity for the exercise of their official duties, demanding kick-backs or bribes is no part of a fiscal intermediary's functions or official duties. This conclusion in no way undermines the purposes for which the immunity defense was erected, as demanding kick-backs or bribes is so beyond the outer perimeters of a fiscal intermediary's statutory duties that there is no risk of "shackl[ing] 'the fearless, vigorous, and effective administration of policies of government.'" *Westfall*, 484 U.S. at 297, 108 S.Ct. at 584 (quoting *Barr*, 360 U.S. at 571, 79 S.Ct. at 1339). To the contrary, the potential harm to individuals and to society in failing to make compensable the damage wrought by such outrageous conduct far outweighs the benefits that a grant of immunity would hold in this case. *See id.* at 299, 108 S.Ct. at 585; *see also Smith*, 499 U.S. at 163, 111 S.Ct. at 1183. Thus, the Court hereby **DENIES** Defendants' motion to dismiss the Puerto Rico law tort claims based on the doctrine of absolute immunity.

## VI. RICO CLAIMS

Defendants also request dismissal on the grounds that Plaintiff has failed to properly allege a civil RICO cause of action against them. FAC bases its RICO claims on sections 1962(c) and (d).[3] To prevail on a RICO claim, Plaintiff must allege and prove that Defendants engaged in a "pattern of racketeering activity," 18 U.S.C. § 1962, and that Plaintiff suffered injuries proximately caused by one or more of the

---

**3.** Section 1962(c) makes it unlawful for any person to conduct the affairs of an enterprise affecting interstate commerce by means of a "pattern of racketeering activity." 18 U.S.C. § 1962(c) (West 1994). Section 1962(d)

makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d) (West Supp.1999).

specified acts of racketeering. *See Camelio v. American Federation*, 137 F.3d 666, 669–70 (1st Cir.1998); *Miranda*, 948 F.2d at 46–47, 48 & n. 9; *Nationwide Mutual Ins. Co. v. Perez*, 52 F.Supp.2d 297, 299 (D.Puerto Rico 1999) (Pieras, J.). Defendants argue that Plaintiff has not properly alleged a pattern of racketeering and that Plaintiff has failed to show causation between Defendants' acts and Plaintiff's injuries.

### A. "Pattern" of Racketeering Activity

■ The statute defines a "pattern" as at least two acts of racketeering, and specifies what acts may serve as predicates for such a claim. *See* 19 U.S.C. §§ 1961(1) and (5). FAC asserts that Defendants engaged in the following RICO predicate acts: wrongful or illegal influence (in July 1995), P.R.Laws Ann. tit. 33, § 4364; extortion (on November 20, 1995), 18 U.S.C. § 1951 and P.R.Laws Ann. tit. 33, § 4218; bribery (on November 30, 1995, December 2, 1995 and May or June 1996), 18 U.S.C. § 201(c) and P.R.Laws Ann. tit. 33, § 4360; and wire fraud (around December 2, 1995), 18 U.S.C. § 1343. FAC clearly has satisfied the requirement that it allege at least two predicate acts of racketeering. *See* 18 U.S.C. § 1961(1).

Defendants argue, however, that the predicate acts alleged do not comprise a "pattern" of racketeering activity. In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the U.S. Supreme Court tackled the issue of what constitutes a "pattern" of racketeering activity within the scope of RICO. The Court granted certiorari to review an Eighth Circuit holding that required a plaintiff to allege and prove multiple schemes in order to satisfy RICO's pattern requirement. *See H.J.*, 492 U.S. at 236, 109 S.Ct. at 2899. The Court reversed the Eighth Circuit, concluding that predicate acts of racketeering may form a pattern even when they are not "part of separate illegal schemes." *Id.* Rather, a pattern exists where two or more predi-

cate acts "are related and pose at least a threat of continued criminal activity." *Feinstein*, 942 F.2d at 44 (citing *H.J.*, 492 U.S. at 238–39, 109 S.Ct. at 2900). The Court will analyze the relatedness and continuity requirements in turn.

### 1. Relatedness

As to the relatedness component, the Supreme Court found that in light of Congress' intent that RICO embody a fairly flexible concept of a pattern, criminal conduct "forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901; *see also Nationwide*, 52 F.Supp.2d at 300. The First Circuit has noted that this test is "not a cumbersome one for a RICO plaintiff." *Feinstein*, 942 F.2d at 44. Here, the allegations set forth in the Complaint all relate to a same or similar purpose: to obtain kick-backs in exchange for the approval of FAC's Medicare claims. *See H.J.*, 492 U.S. at 250, 109 S.Ct. at 2906; *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990). In addition, the predicate acts all involve Rodríguez as a participant. Thus, "as with the vast majority of cases dealing with the RICO pattern requirement, the case before us does not turn on the relatedness of the alleged predicate acts." *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779 (7th Cir.1994). The Court therefore turns to the continuity requirement.

### 2. Continuity

The continuity requirement may be satisfied by one of two methods. *See H.J.*, 492 U.S. at 238, 109 S.Ct. at 2900. By the first method, "a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902.

Because Congress intended RICO to apply only to enduring criminal conduct, predicate acts must extend over a period of time longer than a few weeks or months. *See id.* The treble damages available under RICO are too heavy a sanction to impose on merely sporadic or short-term wrongdoing. The continuity requirement can also be satisfied by a second method, known as the "open-ended" approach. Even where the predicate acts take place within a more narrow time frame, if "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business," there is sufficient continuity for purposes of establishing a pattern. *Id.*

### a. Closed-ended approach

Prior to *H.J.*, the courts had developed a multi-factor analysis for determining whether predicate acts amounted to continued criminal activity under the closed-ended approach, taking into account the number and variety of predicate acts, the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *See Sion*, 893 F.2d at 446 (citing *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987)). In *H.J.*, however, the Supreme Court held that the continuity requirement could be satisfied based solely on the duration factor and the frequency of the acts. *H.J.*, 492 U.S. at 250, 109 S.Ct. at 2906. The fact that the Court made no reference to any other factors that the courts had previously been taking into account in the continuity analysis, led the First Circuit to conclude that duration and frequency of the predicate acts are the touchstones for determining continuity under the closed-ended approach. *See Sion*, 893 F.2d at 446–47; *United States v. Boylan*, 898 F.2d 230, 250 (1st Cir.1990). *But see Vicom*, 20 F.3d 771, 780 (7th Cir.1994) (holding that pre-*H.J.* multifactorial approach still valid).

Here, FAC alleges that six predicate acts took place between July 1995 and July 1997. The final determinate act alleged by FAC, however, occurred in May or June 1996, when Rodríguez requested payment of a kick-back after making a partial claim reimbursement payment to FAC. (Compl.¶ 33). After this event, the Complaint only makes an obscure reference to co-defendants' conspiracy to "defraud the five (5) government hospitals of millions of dollars in legitimate claims up through July 1997 as part of their scheme to illegally obtain money from consultants." (Compl.¶ 34). July 1997 was the date that FAC lost its contract with the Department of Health. FAC is attempting to bootstrap the harm suffered by it to the other determinate predicate acts, construing the effects of the acts as acts themselves for purposes of the continuity analysis. The July 1997 harm is not itself a predicate act, and the Court will therefore treat the relevant time frame as those relevant predicate acts occurring between July 1995 and May or June 1996. *See H.J.*, 492 U.S. at 242, 109 S.Ct. at 2902 (duration of a pattern of racketeering activity measured by the RICO predicate acts committed by defendants).

The Court finds that an eleven month period of time under the circumstances present in this cases is insufficient to satisfy the closed-ended continuity test. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467–69 (2d Cir.1995) (predicates occurring over eleven-month period do not constitute closed-ended continuity). Most courts have required that the predicate acts extend over a period of *at least* one year. *See, e.g., Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir.1999) (noting that the Second Circuit has never found a term of less than two years to meet the requirements of closed-ended continuity); *Vicom*, 20 F.3d at 780 (no closed-ended continuity for predicate act occurring over period of nine months); *Libertad v. Welch*, 53 F.3d 428, 445 (1st

Cir.1995) (no closed-end continuity for acts extending over three month period); *Marshall Int'l v. Redstart,* 935 F.2d 815, 821 (7th Cir.1991) (thirteen months insufficient); *Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989) (one year insufficient); *OCASO, S.A. Compania De Seguros Y Reaseguros v. Puerto Rico Maritime Shipping Authority,* 915 F.Supp. 1244, 1266 (D.Puerto Rico 1996) (seven months insufficient). This approach is sensible and in line with Congress' concern for "long-term criminal conduct" in enacting RICO. *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. Thus, the Court finds that the eleven month period alleged in the Fourth Amended Complaint does not constitute a pattern of racketeering activity within the closed-ended approach. The Court falls short, however, of adopting a per se rule that eleven months does not as a matter of law constitute closed-ended continuity. It merely holds that given the circumstances present in this case, eleven months is insufficient.

### b. Open-ended approach

Because the predicate acts alleged in Plaintiff's Complaint do not support a finding of closed-ended continuity, the Court must determine whether Plaintiff can satisfy the continuity prong under the open-ended approach. Open-ended continuity is present where "the predicates are a regular way of conducting [an] ongoing legitimate business."[4] *H.J.,* 492 U.S. at 243, 109 S.Ct. at 2902; *Sion,* 893 F.2d at 447. In performing this analysis, the Court must look to whether the predicate acts themselves were a regular way of conducting the Defendants' business, not whether Defendants' conduct as a whole, including tortious conduct outside the purview of RICO section 1961(1) occurring in concert with the RICO predicates, were a regular

way of conducting their ongoing legitimate business. *See Sion,* 893 F.2d at 448; *Johnston v. Wilbourn,* 760 F.Supp. 578, 588 & n. 13 (S.D.Miss.1991). Given the dearth of case law addressing this manner of establishing open-ended continuity, *see Vicom,* 20 F.3d at 783, the Court will be guided by the plain meaning of the test.

The Fourth Amended Complaint alleges that Rodríguez demanded bribes or kickbacks in exchange for the approval of FAC's pending Medicare reimbursement claims. (Compl.¶¶ 24, 27, 29, 31). The predicate acts of wrongful or illegal influence, bribery, extortion, and wire fraud were all committed in furtherance of this scheme. It further alleges that Rodríguez himself stated to FAC's Soria that it was standard procedure in COSVI to demand the payment of bribes for this purpose, and that this practice was on-going. (Compl.¶ 27). The Complaint further indicates that Rodríguez linked other high-up officials from New York Region II, including William Saverio, to the scheme, suggesting the existence of a complex bribery network involving multiple actors. (Compl.¶ 29). Moreover, the bribery scheme was in existence, according to the Complaint, before FAC presented its initial claims to COSVI, and it persisted after FAC lost its contract with the Department of Health in July 1997. (Compl.¶ 34).

Taking these allegations as true and viewing them in the light most favorable to Plaintiff for the purposes of this motion to dismiss, the Court finds that Plaintiff's allege in the Complaint that the predicate acts were a regular way of conducting an ongoing legitimate business. Rodríguez himself is alleged to have admitted that it was standard operating procedure for COSVI to insist on the payment of bribes as a prerequisite to approval of Medicare claims. That this case involves a large

---

4. Open-ended continuity can also be established when there is a specific threat of repetition or "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *H.J.,* 492 U.S. at 242–43, 109 S.Ct. at 2902.

The allegations in Plaintiff's Fourth Amended Complaint, however, plainly do not support either of these alternate methods of fulfilling the continuity requirement under the open-ended approach. The Court therefore limits its discussion accordingly.

Medicare fiscal intermediary making decisions on claims involving millions of dollars, and the decision to approve or deny claims rests with multiple decision-makers, further suggests that multiple actors were acting in concert to facilitate the scheme. This does not look like the case of an isolated bribe, or a bribe with a definite end-point, so as to negate any threat of ongoing unlawful business activity. The Court holds, therefore, that the Complaint satisfies the requirement of pleading open-ended continuity.

As the Complaint alleges both relatedness and continuity among the predicate acts, Defendants' motion to dismiss Plaintiff's RICO claim for failure to allege a pattern of racketeering activity is hereby **DENIED.**

### B. RICO Conspiracy Claim

■ Plaintiff alleges that Defendants violated RICO section 1962(d) by conspiring to violate section 1962(c). Defendants argue, however, that Plaintiff has not alleged the involvement of co-defendants Dolagaray, Brull, Ortiz, Rivas or Santiago in the conspiracy. To establish a conspiracy claim under section 1962(d), the Plaintiff need not prove that the conspirator has committed or agreed to commit the two or more predicate acts. *See Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.* at 63, 118 S.Ct. at 477 (citing *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 253–54, 60 S.Ct. 811, 858–59, 84 L.Ed. 1129 (1940)). A conspiracy may call for some co-conspirators to carry out the predicate acts and for others merely to provide support to the overall conspiracy. In such a case, those providing support are as guilty as the perpetrators of the acts themselves. *See id.* at 63–64, 118 S.Ct. at 477.

As the Supreme Court explained, section 1962(d) contains no requirement of an overt act to effect the object of the conspiracy. *See id.* RICO's conspiracy provision therefore casts a wider net than the general conspiracy provision applicable to federal crimes, section 371. *See id.* Thus, under RICO, although "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, [ ] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65, 118 S.Ct. at 477. A conspirator need not agree to undertake all of the acts necessary for the crime's completion. *See id.*

The Complaint sets forth six predicate acts, each carried out by Rodríguez. In July 1995, the Complaint asserts that Rodríguez violated Puerto Rico law when he suggested that he could positively influence the outcome of FAC's Medicare reimbursement claims if he was permitted to meet with FAC shareholders. *See* P.R.Laws Ann. tit. 33, § 4364. The Complaint then alleges that on November 20, 1995, Rodríguez demanded a kick-back in exchange for the approval of FAC's pending claims, in violation of 18 U.S.C. § 1951 and P.R.Laws Ann. tit. 33, § 4218 (extortion). On November 30, 1995, December 2, 1995, and around May 1996, according to the Complaint, Rodríguez violated both federal and Puerto Rico bribery statutes, 18 U.S.C. § 201(c) and P.R.Laws Ann. tit. 33, § 4360, when he demanded to be paid 40% of the proceeds from the FAC claims approved by COSVI as well as a fee for the advance payment made to FAC. On December 2, 1995, the Complaint states that Rodríguez communicated to a FAC shareholder that he had spoken to Saverio in New York Region II regarding the denial of FAC's claims if the kick-backs were not paid to him, in violation of 18 U.S.C. § 1343 (wire fraud). Saverio is not a co-defendant in this action.

■ Rodríguez is the only co-defendant identified as carrying out the predicate acts. Although failure to allege the participation of other co-defendants in overt acts in furtherance of the conspiracy is

not fatal per se, the Complaint is also devoid of allegations of an agreement among co-defendants to advance the conspiracy or of co-defendants' adoption of the goal of furthering or facilitating the criminal endeavor. The only person linked to the conspiracy as a facilitator is Saverio, a non-party. Plaintiff asserts in vague and conclusory terms that the other co-defendants assisted Rodríguez in carrying out the scheme to unlawfully deprive FAC of its Medicare reimbursement claims. These conclusory statements, however, are insufficient to link any other co-defendant to the conspiracy. *See Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994) (holding that in a motion to dismiss, the Court "do[es] not credit conclusory allegations"). Plaintiff's conspiracy claim therefore cannot stand, except as against Rodríguez, given that Plaintiff's allegations relate only to his and Saverio's participation in the scheme. The Court therefore **DISMISSES** Plaintiff's section 1962(d) claim against co-defendants Dolagaray, Brull, Ortiz, Rivas, and Santiago.

Although Defendants did not specifically raise the argument that the same defects attendant to the section 1962(d) claim against co-defendants Dolagaray, Brull, Ortiz, Rivas, and Santiago impugned the section 1962(c) claim raised against these co-defendants, the Court finds that Plaintiff's failure to connect any of these co-defendants to the RICO predicate acts forming the basis of the section 1962(c) claim merits dismissal of the Complaint against them. This is particularly true in light of the First Circuit's insistence on greater factual specificity for allegations of RICO violations. *See Langadinos v. American Airlines, Inc.,* 199 F.3d 68, 72 (1st Cir.2000) (citing *Miranda,* 948 F.2d at 44). The Court therefore **DISMISSES** Plaintiff's section 1962(c) claim against co-defendants Dolagaray, Brull, Ortiz, Rivas, and Santiago.

### C. Causation

To satisfy the causation element under section 1962(c), Plaintiff must allege that one or more of the specified acts of racketeering was the proximate cause of the injuries of which Plaintiff complains. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992); *Camelio,* 137 F.3d at 669–70. Defendant avers generally that Plaintiff has failed to show a nexus between the predicate acts alleged and Plaintiff's injuries. Plaintiff's injuries stem from lost profits and insolvency that occurred after Defendants denied its Medicare reimbursement claims. The predicate acts involved a bribery scheme that bore directly upon whether those claims were approved or not, and Plaintiff alleges that it lost profits as a result of its failure to succumb to Defendants' entreaties to join in its unlawful scheme. A demand for a bribe does not cause lost profits itself, but the effects of refusing to pay the bribe is certainly actionable. *See In re American Honda Motor Co., Inc. Dealerships Relns. Litigation,* 941 F.Supp. 528, 545 (D.Md.1996) ("That plaintiff dealers would be deprived of profits is the direct and foreseeable result of the alleged scheme to give and receive bribes in exchange for higher allocations of cars."); *Mylan Labs., Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1084 (D.Md.1991) (holding that bribery scheme alleged to have caused plaintiff lost profits not subject to dismissal).

In closing, the Court notes that Plaintiff ultimately bears the burden of establishing each element of its RICO cause of action at trial, including causation. The Court has only held that Plaintiff's Complaint should not be dismissed for failure to allege the requisite elements for a RICO cause of action.

### VII. PENDENT JURISDICTION

A federal court may exercise pendent jurisdiction "over all other claims that are so related to the claims in the action within

[the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see also Camelio*, 137 F.3d at 672. Defendants contend that dismissal of Plaintiff's federal claims would require the Court to decline jurisdiction over the state law claims. This Court has not dismissed Plaintiff's federal claims, however, and Defendants have not advanced any other argument to convince the Court that it should decline to exercise pendent jurisdiction over Plaintiff's related state law claims. The Court therefore **DENIES** Defendants' request for dismissal of Plaintiff's state law claims.[5]

## VIII. CONCLUSION

In view of the foregoing, the Court hereby **GRANTS IN PART** Defendants' Motion, and **DISMISSES** Plaintiff's 1962(c) and 1962(d) RICO claims against co-defendants Dolagaray, Brull, Ortiz, Rivas, and Santiago. The other grounds for dismissal raised by Defendants are hereby **DENIED** for the reasons set forth above.

**IT IS SO ORDERED.**

---

5. Defendants also dedicate a portion of their brief to a discussion of the affirmative defenses raised in their Answer, such as waiver, estoppel, laches, mitigation of damages, and unclean hands. Defendants then note that further discovery is required before Defendants would be in a position to file a dispositive motion based on some of these defenses. It is unclear to the Court, then, what Defendants' intention was in raising these issues in the motion, particularly where some, like mitigation of damages, are neither dispositive nor questions capable of resolution by the Court at this juncture. The Court also cautions Defendants that raising every conceivable defense, without regard to the merit of these theories, not only unduly burdens the Court but undermine's counsel effectiveness. Accordingly, the Court hereby **ORDERS** that Defendants may renew their motion, raising only those defenses that are of substantial merit, at the risk of sanctions should the Court find Defendants raising frivolous legal theories, on or before **June 15, 2000.**